## STATE OF OREGON,
*Respondent,*

*v.*

## FREDERICK BRIAN GARDNER,
aka Brian Gardner, aka Fred Gardner,
*Appellant.*

(10-81-03138; CA A25712)

679 P2d 306

Carla D. Thompson, Salem, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Robert E. Barton, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Defendant appeals his conviction for arson in the first degree. ORS 164.325. He was sentenced to twenty years imprisonment and ordered to pay $60,700 restitution. We affirm.

Defendant was accused of conspiring with the dwelling's owners to burn the house for pay. On November 4, 1980, the home of Cheryl Storm and Michael Moon in Veneta was almost completely destroyed by fire. Moon and Storm were not home at the time of the fire. In the fall of 1979, defendant had lived with them in the house. During November, 1980, he resided in Arizona. The state's primary witness was Michael Bramwell, who had lived in the garage of the house where defendant lived in Arizona. Bramwell testified that in October, 1980, defendant asked him how he would "go about torching a house." Bramwell told him that he had seen a television show in which an accelerant had been used that would not leave a trace and told defendant where he might purchase it on the way to Oregon. Bramwell said that defendant told him the job was "worth $10,000" and that the owner's reason for doing it was that he was heavily in debt from gambling. He also testified that on October 21, 1980, he answered the telephone at defendant's residence, and a female voice left a message: "This is Oregon. Tell Brian that the money is on the way. All we could get was three hundred." Later in October, Bramwell took a message from a male caller: "This is Moon. Tell Brian the house will be empty till after the 4th * * *." Bramwell also testified that on November 1, 1980, he received a call from defendant, who told him he was in Reno, had picked up the accelerant and was on his way to Oregon with a companion, Lane Lolley. Bramwell stated that defendant was back on November 5 and said that it had gone "smooth as silk" and that Lolley stated it "went up like a match box." Bramwell went to the police with this information in March, 1981.

Another state witness, Parrott, testified that defendant approached him in October, 1980, "with a proposition to burn a house in Oregon." Parrott said that, around November 5, defendant told him that he had done it, that he had "put a hole in the wall beside the heater and put alcohol in between the walls" and that Lolley was in the car when he did it.

Defendant admitted that he had been in Oregon at the time of the fire but said that he had accompanied Lolley to Portland to help him collect a debt. He testified that he had stopped in Eugene on the way, but did not go to Veneta. He denied the conversations with Bramwell and Parrott to which each had testified and minimized the extent of his relationship with Bramwell. He said that he did not learn of the fire until November 6 or 7. He introduced evidence that the dining room heater had been malfunctioning not long before the fire.

Oregon State Police Fire Investigator Shiell testified that, in his opinion, the fire was caused by arson. Buske, an arson investigation expert and consulting physicist, testified that his examination of the burned residence disclosed that the heater in the dining room area had been in the "on" position, but was not operational at the time of the fire. He also explained that the burn pattern of the structure suggested the use of a liquid accelerant. He concluded that the probable cause of the fire was arson.

Defendant raises several assignments of error. He argues that the court erred in denying his motion to suppress a letter seized from his residence in Arizona pursuant to a search warrant issued in an unrelated investigation. The letter was introduced on cross-examination of defendant. Dated November 13, 1980, it was written by defendant to one Wellman, with whom he claimed to be involved in some business dealings:

"It is unfortunate that these letters take as much time as they do between destinations.

"Assuming that the circumstances in South West were semi-stable, I re-invested almost all monies in hopes of acquiring greater returns in less time. Not being able to regain these immediately, I have taken *severe* steps in various directions to satisfy your request for 700- and to remain above board.

"I have just returned from a Four-day business trip out of state. Oddly enough I learned upon my return, that arson had been committed on the lands of one of our investors. It seems strange, but this does facilitate the payment of a substantial debt to our account.

"More problems plagued the game. I had to shut down for a couple of weeks after learning that one of the players had contracted infectious hepatitis. The risk was obviously too

great. Not only that, but my communications with cousin had to be through another person, for fear of being a carrier over a gestating period of time.

"Things are a little rugged, but keep the faith --- I will get it done on this end. No word from Virginia about anything. They seem disinterested. I only hope that in this melee, your health and welfare have not suffered. I will telegraph good news upon receiving it."

The state made an offer of proof before cross-examining defendant. Defendant objected to admission of the letter on several grounds.

■        He argues that under the Fourth Amendment to the United States Constitution and Article I, § 9, of the Oregon Constitution, the letter should not have been admitted because it *may* have been illegally seized. The court overruled defendant's objections on the ground that, under *United States v. Havens,* 446 US 620, 100 S Ct 1912, 64 L Ed 2d 559 (1980), the letter may be used to impeach even if it *was* improperly seized. To our knowledge, the question presented in *Havens* has not been decided under the Oregon Constitution. Defendant suggests that it is impermissible under Article I, § 9, to use improperly seized evidence that is inadmissible in the state's case in chief as impeachment evidence. We do not reach that issue, because we conclude that defendant did not preserve the error. Because the letter was seized pursuant to a search warrant, defendant had the burden of proving that the search was improper. *State v. Nearing/Baker,* 16 Or App 30, 33, 517 P2d 308 (1973). That the letter *may* have been illegally seized is not a sufficient objection. Defendant did not particularize his conclusion that the evidence may have been illegally seized. It was up to him to move to suppress the letter on particular grounds; the state was not required to prove that it was legally seized.

According to defendant, he was denied the opportunity to contest the legality of the seizure, because the letter was introduced on cross-examination after the prosecutor assured him prior to trial that he would not introduce any evidence seized in the Arizona search. When defendant raised this issue, the court stated:

"THE COURT: Well, let's make it clear. We had a conversation, you, I and Mr. Papagni [deputy district

attorney], before the trial started, where the subject of this letter, and I didn't see it or anything like that, came up. And Mr. Papagni said that he would not offer it in his case in chief, but he thought he might try to offer it in his — his cross-examination or rebuttal, if the defendant testified. You indicated that you would like to preserve your right to move to suppress, and Mr. Papagni conceded that — that you had a right to raise the issue of suppression, because he had represented, apparently previously, to you that he would not offer it in his case in chief."

As evidence of the state's promise not to introduce evidence seized from Arizona, defendant's counsel read to the court a letter he had written to the prosecutor before the trial.

"This letter is to confirm our earlier conversation regarding the above-entitled case,' meaning STATE v. BRIAN GARDNER. 'It is my understanding from our conversation that you do not intend to offer at trial any evidence that was seized from the residence * * * in * * * Arizona, on November 17, 1980.'

"And then I went on to state that, 'I do understand you intend to offer telephone records, and no objection is contemplated.' * * *"

The court's pretrial discussion with prosecution and defense counsel is not in the record. The only indication we have that the prosecution might have made a promise not to introduce the letter *for any purpose* is defense counsel's self-serving letter. As noted above, the court found that the prosecution's previous representation was that he would not offer it *in his case-in-chief*. The record does not demonstrate that defendant was denied an opportunity to contest the legality of the seizure of the letter. According to the court's finding, defendant was on notice that the evidence might be introduced otherwise than in the state's case-in-chief. Further, the record does not indicate that defendant at any time requested a continuance to investigate the circumstances of the search or to file an appropriate motion to suppress the letter.

■        Defendant also contends that the letter was not relevant or proper impeachment. The letter was relevant as an inconsistent statement.[1] Defendant had testified that his

---

[1] The state argues that it was relevant, because it supported the state's theory of the case. However, the issue is whether it was permissible impeachment of defendant's credibility, not its relevance as substantive evidence.

purpose in going to Oregon was to help Lolley collect a debt; the letter may be understood to characterize the trip differently. The letter refers to "arson," which indicates that defendant believed the fire to be caused by arson, although, according to his testimony, he did not go to Veneta.

Defendant also argues that the prejudicial impact of the evidence outweighed its probative value. The factors applicable to any evidence are also to be weighed when evidence is introduced relevant to the witness' credibility. We review for abuse of discretion. We conclude that the court did not abuse its discretion in admitting the evidence. Defendant also argues that there was no foundation for the letter, but that objection was not raised below, and we will not consider it.

Defendant assigns as error the denial of a motion to strike evidence of "bad acts" and the court's failure to grant a mistrial on its own motion because of the admission of the testimony. Both Bramwell and Parrott testified that Bramwell had manufactured an illegal drug in defendant's kitchen while defendant was present. Defendant moved to strike that testimony, arguing that the state had failed to demonstrate a business connection between Bramwell and Gardner[2] and that therefore the testimony was not "relevant impeachment evidence."

■       OEC 404(3) provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, *such as* proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (Emphasis supplied.)

The list in OEC 404(3) is not exclusive. "Other crimes" evidence is essentially a special application of general relevance analysis. *State v. Sjogren,* 39 Or App 639, 642, 593 P2d 1188 (1979). We consider whether the evidence is probative of a fact the state is entitled to prove and then balance the probative value of the evidence against its tendency to prejudice defendant. *State v. Sjogren, supra;* OEC 401, 403.

---

[2] In the original offer of proof, Bramwell testified that defendant received "a little" money from the illegal drugs. There was no such testimony before the jury.

■　　Here, the evidence was probative to establish the nature of defendant's relationship with Bramwell. Defendant generally tried to minimize the extent of their connection. He testified that he did not trust Bramwell, that he did not really have a relationship with him and that he occasionally allowed him to use the kitchen, because he could not afford to eat out. The testimony regarding the illegal drugs tended to show that there was enough of a relationship of trust between the two that defendant would allow Bramwell to manufacture an illegal drug in his home. That fact made it more likely that defendant would confide in Bramwell about his arson plans and ask his advice, as Bramwell testified and defendant denied.

■ ■　　The determination whether probative value outweighs prejudice is a matter of trial court discretion. *State v. Hall,* 36 Or App 133, 136, 583 P2d 587 (1978). Although the evidence portrayed defendant as someone who allowed the manufacture of controlled substances in his home, the prejudice is minimized by the fact that he was not preparing it himself. It is also significant that the act was not similar to the crime charged. *See State v. Carden,* 58 Or app 655, 659-60, 650 P2d 97, *rev den* 293 Or 653 (1982); *State v. Sjogren, supra.* In addition, other evidence of defendant's involvement with drugs had already been admitted. Defendant had testified on direct examination that he had been convicted of possession of marijuana. We conclude that the trial court did not abuse its discretion in determining that the probative value of the evidence outweighed the prejudice. It follows that the court did not err in failing to grant a mistrial on its own motion.

■　　Defendant moved for acquittal at the end of the state's case on the ground of insufficient evidence. The court did not err in denying the motion. Defendant stresses that there was no direct evidence that he was near the scene of the fire the night it burned. The evidence includes Bramwell's testimony and Parrott's testimony regarding defendant's statements before and after the fire, defendant's admission to being in Oregon the night of the fire and two expert witnesses' opinions that the fire was caused by arson. Telephone records corroborated telephone calls by Moon and Storm to defendant before the fire. There was sufficient circumstantial evidence for a jury to find defendant guilty beyond a reasonable doubt. *State v. Krummacher,* 269 Or 125, 523 P2d 1009 (1974).

■ As part of his sentence, defendant was ordered to pay a total of $60,700 in restitution to the insurer of the destroyed home and to another party with an interest in the home, the amount to be due within six months of the expiration of his parole. In two assignments of error, defendant attacks the order on several grounds, including the Oregon Constitution, Article I, §§ 15 and 16, and ORS 161.675, 138.040 and 138.050. The only argument defendant made below was that the court had insufficient facts from which to find that he was able to pay the amount ordered, and we decline to consider the other contentions. *See State v. Deloge,* 55 Or App 742, 639 P2d 1293 (1982).

The trial court based its conclusion that defendant could pay the restitution on the fact that he had previously made a living in the logging industry. That finding is supported by the record, and the conclusion is permissible that defendant would be able to earn money to pay the restitution. *See State v. Mitchell,* 48 Or App 485, 617 P2d 298 (1980). The court also took into account that defendant was likely to be paroled before serving the entire twenty-year sentence and that his only indebtedness was to his parents in the amount of $2,000. Although the order provides that the amount is due six months after parole expires, ORS 144.275 authorizes the parole board to devise a payment schedule consistent with a defendant's ability to pay the restitution. If defendant is later in fact unable to pay, he may petition the court to adjust the terms or amount of payment. ORS 161.685. Those factors convince us that the trial court did not err in finding defendant able to pay restitution. *See State v. Mitchell, supra.*

Affirmed.